**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-35 (RC)** |
| **BENJAMIN SILVA,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Benjamin Silva to eleven months' incarceration – at the low end of the Guidelines range of eight to fourteen months – a term of three years of supervised release, $2,000 in restitution and a $100 special assessment.

## I.    INTRODUCTION

The defendant, Benjamin Silva, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Silva, a tugboat captain and father of four from Washington State, marched to the Capitol after attending the Stop the Steal rally. Silva joined the riot that broke out on the West Front of the U.S. Capitol and despite experiencing the effects of tear gas, pressed forward, up and into to the Lower West Terrace tunnel. Silva entered the tunnel at least two times, joined in at least one heave-ho push against the police inside the tunnel, saw other rioters throw items at police, was sprayed with OC spray by police, pushed directly up against officers in the tunnel, and remained in the tunnel for a total of approximately twenty minutes.

The government recommends that the Court sentence Silva to eleven months of incarceration for his conviction for obstructing officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). An eleven-month sentence reflects the gravity of Silva's conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 154, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

than 2.9 million dollars. Silva's criminal conduct took place primarily inside the Lower West Terrace Doors, known as "the tunnel." Exhibit A[2] includes a video compilation overview of the timeline of events at the tunnel on January 6, 2021.

     **B.**     **Silva's Role in the January 6, 2021 Attack on the Capitol**

     Benjamin Silva, a tugboat captain and father of four, traveled from Washington State to Washington, D.C. to attend the Stop the Steal rally. Silva attended the rally at the Ellipse on the morning of January 6, 2021 and then marched with thousands of others to the U.S. Capitol. By the time Silva arrived on the West Front of the U.S. Capitol, dozens of police officers had established a police line to keep rioters away from the building. Silva remained on the West Front as rioters began to fight the police and experienced the effects of tear gas. *See* Exhibit B, open-source video at timestamp 00:28. Undeterred, Silva joined the crowd and climbed up to the Inaugural Stage after the police were forced to retreat. *See* Exhibit C, open-source video. In fact, Silva was among the first group of rioters to arrive on the Inaugural Stage.

---

[2] The government's exhibits will be provided to the Court and the defense separately via the government's file-sharing platform.



*Image 1: Still image from Exhibit C at timestamp 00:00 showing Silva on the Inaugural Stage soon after it was breached by rioters*

At approximately 2:48 p.m., Silva approached the mouth of the Lower West Terrace tunnel.

*See* Exhibits D (open-source video) and E (CCTV footage).



*Image 2: Still Image from Exhibit E at timestamp 2:48:42 showing Silva's entrance into the tunnel*

  Silva entered the tunnel at 2:49 p.m., only about six minutes after the tunnel was initially breached by rioters. *See generally* Exhibit A. Silva immediately pushed through the crowd to the police line. *See* Exhibit E, CCTV footage. Silva was pushed out of the tunnel by the crowd at 2:51 p.m. *See* Exhibit F, CCTV footage. Silva then entered the tunnel a second time at 2:56 p.m. and again pushed immediately to the police line. *See* Exhibit G, CCTV footage. By approximately 2:58 p.m., Silva had moved further back in the crowd in the tunnel. *See* Exhibit H, CCTV footage. He stayed a few rows back from the police line for approximately five minutes.



*Image 3: Still image from Exhibit I at timestamp 00:10 showing Silva in the tunnel*

During the time Silva stood near the archway in the tunnel, he saw: (1) a rioter right in front of him throw a long pole at police (Exhibit I, open-source video, at 00:09); (2) a rioter in front of him with large amounts of orange OC spray on his face (*id.* at 00:15); (3) rioters holding stolen U.S. Capitol police riot shields (*id.* at 00:33); (4) a second rioter throw another long pole at the police (*id.* at 00:48); (5) a rioter directly in front of him screaming out after being sprayed with

OC spray (*id.* at 1:03); (6) the rioters in the tunnel coordinating in a heave-ho push (*id.* at 3:00); and (7) rioters right next to him decontaminating their eyes after being sprayed with OC spray (*id.* at 4:08). After standing in the tunnel watching rioters fight the police for at least three minutes, Silva was sprayed with OC spray by the police. *Id.* at 3:33. Again, undeterred, Silva merely ducked behind the rioter in front of him and held his ground.



*Image 4: Still image from Exhibit 1 at timestamp 3:33 showing Silva ducking from OC spray*

Approximately one minute later, Silva was directly behind co-defendant Casey Tryon-Castro as she and other rioters ripped a U.S. Capitol police shield out of the hands of an officer. *Id.* at 4:22. The police deployed OC spray to try to maintain possession of that shield and it appears that the OC spray hit Silva as well. *Id.* Around this time, a large number of rioters left the tunnel leaving ample room for Silva and others to leave as well, but Silva remained. *Id.* at 5:00. In fact, far from leaving, Silva took this opportunity to move to the front of the crowd and confront the police. *See* generally Exhibit J, open-source video.



*Image 5: Still image from Exhibit J at timestamp 00:16 showing Silva confronting the police between co-defendants Micaiah Joseph and Casey Tryon-Castro*

Body-worn camera footage shows that as Silva approached officers, an officer stuck his

hand out to Silva to tell Silva to stop, but Silva did not comply. *See* Exhibit K, body-worn camera footage. In fact, the footage shows that the officer pushed Silva back multiple times. Each time, Silva pushed back against the officer, either to stand his ground or to come closer to the officer.



*Image 6: Still image from Exhibit K showing an officer gesturing to Silva to stop his advance*

After arriving at the police line, Silva initially appeared to speak to an officer on the line. Exhibit J at 00:25. Then, as officers deployed OC spray in his direction and over his head, he put his head down and pushed into the officers. *Id.* at 00:38. Body-worn camera footage shows that Silva was clearly pushing against officers from the position of his body.

9



*Image 7: Still image from BWC showing Silva with one leg braced back and an arm up pushing against officers in the tunnel*

As police continued to deploy OC spray to get rioters (including Silva) to move back, Silva threw up his arm in front of his face to deflect the spray. Exhibit J at 00:55. Silva ducked his head and bent his body toward the police, even resting his hand on the police shield directly in front of him.



*Image 8: Still image from Exhibit J at timestamp 1:07 showing Silva pressed against officers in the tunnel*

Only when Silva was sprayed directly in the face with OC spray did he finally leave the police line. *Id.* at 1:25. As Silva left the tunnel, eyes clenched from OC spray, a nearby rioter thanked him for "his service" and asked his name. Silva responded, "Ben Silva from Washington State!" as the rioter decontaminated Silva's eyes with water. *See* Exhibit L, open-source video. Silva left the tunnel at 3:08 p.m., approximately twenty minutes after his initial entry. *See* Exhibit

M, CCTV footage.

### III.    THE CHARGES AND PLEA AGREEMENT

On September 6, 2023, a federal grand jury returned a superseding indictment charging Benjamin Silva with four counts, including, interfering with police officers during a civil disorder in violation of 18 U.S.C. § 231(a)(3). ECF No. 114. On April 5, 2024, Silva was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Silva now faces sentencing on a single charge of interfering with police officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, $2,000 in restitution, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). That guidelines analysis, as set forth in the plea agreement and PSR, is as follows:

**Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic – Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1) |
| Acceptance of Responsibility | -2 | U.S.S.G. § 3E1.1(a) |
| Total | 11 | |

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

Section 4C1.1 does not apply in this case because the defendant used violence or a credible threat of violence against people or property under a totality of the circumstances analysis. Violence was defined by Judge McFadden as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." Judge McFadden also defined it as "the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting Judge McFadden's definition of violence from Bauer). Here, as set out above, Silva physically pushed up directly against officers inside the tunnel, as shown in open-source video and body-worn camera footage. Therefore, Silva "use[d] physical force" "with the intent to harm," and is not eligible for a reduction under § 4C1.1.

13

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 64. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 11, Silva's Guidelines imprisonment range is 8 to 14 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

**VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Silva's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Silva's criminal conduct inside the Lower West Terrace tunnel contributed to the worst and most violent siege against the police that day. Silva willfully joined the battle against the police in the tunnel after seeing multiple rioters throw items at the police, fight the police and steal items from the police. He spent a total of 20 minutes inside the tunnel, despite multiple chances to leave and even entered the tunnel a second time after initially leaving. He was a willing participant in the violence against the police on January 6. Therefore, the nature and circumstances of Silva's offense were of the utmost seriousness, and fully support the government's recommended sentence of eleven months' imprisonment.

### B.  The History and Characteristics of the Defendant

Silva is a 37-year-old tugboat captain from Washington State. PSR at ¶¶ 70, 103. He described his childhood as "really good" and enjoys good relationships with his parents and five siblings. PSR at ¶¶ 77, 79. Silva is married and has four children. PSR at ¶¶ 80, 81. Silva has no criminal history. PSR at ¶¶ 63-64.

Silva's background is both mitigating and aggravating. While Silva's good relationship with his family and lack of criminal history suggest he is at a lower risk of recidivism, these factors also make it clear his crime was not motivated by poverty, abuse or neglect. Silva had many choices other than to attack the police inside the Lower West Terrace tunnel on January 6. Silva's

motivation appears to have been nothing more than that his preferred candidate lost an election. Under these circumstances, his supportive family life and lack of criminal history are a neutral factor and support a Guidelines sentence.

The Presentence Investigation Report also notes that, according to Silva's wife, Silva lost his job as a tugboat captain shortly after he pleaded guilty in this case. PSR at ¶ 103. Specifically, it appears Silva will not be able to maintain his required Coast Guard security clearance due to his conviction. *Id.* While Silva is likely to argue that the loss of Silva's position and his security clearance is mitigating and supports a lower sentence in this case, the government disagrees. The loss of Silva's job is a direct consequence of Silva's decisions and actions on January 6.   In making his decision to attack the police and try to break into the U.S. Capitol, Silva should have considered what impact those actions would have on his life. And the fact that Silva had security clearance when he committed this crime against his government is aggravating, not mitigating. Silva was entrusted by his government with access to protected information as part of his job. He betrayed that trust by his actions against that same government on January 6. His job and his security clearance were not enough to deter his criminal conduct, and therefore, their loss should not be considered as an ancillary punishment or as mitigation by this Court.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Silva's criminal conduct on January 6 was the epitome of disrespect for the law. Not only did Silva's actions interrupt a fundamental function of our government but he also directly interfered with police officers who were just doing their jobs. As Judge Berman-Jackson noted,

"we cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." United States v. Cronin, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. Silva's persistent fight against the police in the tunnel suggests specific deterrence is still necessary. A sentence of eleven months – in the middle of the Guidelines range – will serve the need for specific deterrence here.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*,

18

671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Patrick Bournes,* 23-CR-35 (RC). Bournes is the only one of Silva's co-defendants to have been sentenced. For a conviction for violation of 18 U.S.C. § 231(a)(3), this Court sentenced Bournes to 4 months' imprisonment to be followed by 4 months of home detention. As this Court knows, Bournes was inside the tunnel for significantly less time than Silva – approximately eight minutes – and did not press up directly against officers while inside the tunnel. In this way, his case is distinguishable from Silva's and Silva should receive a higher sentence of eleven months' imprisonment.

*United States v. Kyle Kumer*, 23-CR-237 (CJN). Kumer was also convicted of a violation of 18 U.S.C. § 231(a)(3) for his actions against the police inside the Lower West Terrace tunnel. Kumer was inside the tunnel for approximately 25 minutes, compared to Silva's 20 minutes in the tunnel. Kumer brought his elderly mother into the tunnel with him and participated in at least five separate heave-ho pushes against the police line, though Kumer – unlike Silva – never pushed directly against officers in the tunnel. However, Kumer's conduct also contributed to the injuries suffered by MPD Officer Hodges inside the tunnel. Judge Nichols sentenced Kumer to 10 months' incarceration. A sentence of eleven months' incarceration for Silva accounts for the fact that Silva didn't cause injury to officers.

*United States v. Roger Baugh*, 22-cr-313 (JEB). Baugh traveled to Washington for the "Stop the Steal" rally and after the rally, walked to the Capitol. After entering the secure perimeter, Baugh went up to the LWT tunnel. Baugh, like Silva, saw what was happening in the tunnel and

purposefully injected himself into the fray. And, after witnessing the assaults on officers that were ongoing in the tunnel, Baugh, like Silva, responded to the call of other rioters for help and joined in the coordinated push against officers. Judge Boasberg sentenced Baugh to twelve months and one day of incarceration.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Silva must pay $2,000 in restitution, which reflects in part the

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

role Silva played in the riot on January 6.[8]  Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Silva's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 141.

## VIII.   FINE

The defendant's convictions for violation of 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of up to $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. PSR at ¶ 119.

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of eleven months' imprisonment, three years of supervised release, $2,000 in restitution and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


BY:    /s/ *Kaitlin Klamann*
       KAITLIN KLAMANN
       Assistant United States Attorney